COURT OF APPEALS OF VIRGINIA

Present:   Judges Raphael, Lorish and Frucci
Argued at Arlington, Virginia


AV AUTOMOTIVE, L.L.C., ET AL.

v.        Record No. 2168-23-4

DONALD B. BAVELY, ET AL.

OPINION BY
JUDGE STUART A. RAPHAEL
AUGUST 12, 2025

DONALD B. BAVELY

v.        Record No. 2165-23-4

AV AUTOMOTIVE, L.L.C., ET AL.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David A. Oblon, Judge

Monica T. Monday (David R. Berry; Edward W. Cameron; Matthew
Sorensen; Richard G. Cole III; Gentry Locke; Cameron McEvoy,
PLLC, on briefs), for AV Automotive, L.L.C., et al.

Mihir V. Elchuri (Robert R. Vieth; Thomas J. Dillon, III; Andrew K.
Clark; Emily M. Scott; Franklin R. Cragle, III; Hirschler Fleischer,
P.C., on briefs), for Donald B. Bavely

No brief or argument for appellees Sarah L. Kee, The 2013 DVM
Trust, and The 2013 JMW Trust.


This case arises from a long and bitter dispute over the ownership and control of several

closely held companies in the Rosenthal Automotive empire, including AV Automotive, L.L.C.

In 2018, after the decline of the family patriarch—Robert M. Rosenthal—the family members

who owned the majority interest in AV ousted Rosenthal's business partner, Donald B. Bavely,

as a member and president of AV.  They argued that Bavely had engaged in self-dealing and, in

2014, had breached AV's operating agreement by transferring a portion of his membership

interest to his fiancée without notice to the other members. They claimed that the transfer triggered a forced-buyout provision in the operating agreement that entitled AV's other members to buy Bavely's entire membership interest.

AV and various of its members (collectively "AV")[1] sued Bavely in February 2019 for conversion, breach of contract, breach of fiduciary duty, and fraud. The ad damnum in their 14-count third amended complaint sought (among other things) $75 million in compensatory damages and equitable relief to expel Bavely from the company and restrain him from interfering with it. Bavely's 12-count counterclaim sought (among other things) a declaratory judgment that he was entitled to exercise a "death option" to buy all of Rosenthal's interest in AV; about $60-70 million in damages; and equitable relief to restore his equity interest in AV. Both sides sought attorney fees under a fee-shifting provision in the operating agreement.

The legal battle in the trial court spanned four years and nine months, generating a 53,408-page record. A plea-in-bar jury found after a weeklong trial that AV's breach-of-fiduciary-duty claims were time-barred. The parties' remaining claims were tried before a different jury for 43 days. In a surprise move during closing argument, AV's counsel asked the jury to give it a "clean break" from Bavely by awarding him damages on one count of Bavely's breach-of-contract counterclaim. AV argued that doing so amounted to buying out Bavely's interest, which was better than letting him back into the company. The jury obliged, awarding Bavely buyout damages of $17,654,445 and rejecting all the parties' remaining damage claims. The trial court then denied Bavely's equitable claims, including his request to be reinstated to AV. The court found that the jury verdict was consistent with AV's having bought out Bavely's interest and that reinstating Bavely would be too disruptive to the company.

---

[1] The AV parties are AV Automotive, L.L.C., eight of AV's members, and three co-trustees of the Robert M. Rosenthal Trust.

Each side claimed to be the prevailing party entitled to attorney fees under the operating agreement. Both sides asked the trial court to frame the question by viewing all the fee-bearing claims together as a whole, a framing that we call the "gestalt" approach. On that framing, the trial court declined to shift any fees. Considering the litigation as a whole, the court found that neither side had prevailed compared to the magnitude of what each had sought.

AV and Bavely separately appealed, and we consolidated their appeals for argument. Bavely argues that he should have been awarded prevailing-party attorney fees. AV's claims are more ambitious. First, it seeks to revive its breach-of-fiduciary-duty claim that the plea-in-bar jury found time-barred. Second, AV asks us to vacate the $17.7 million judgment for Bavely on his breach-of-contract counterclaim and to remand that claim and AV's breach-of-contract claim for a new trial. AV argues that the trial court misinterpreted the buyout provision by not recognizing that AV properly bought out Bavely's entire interest in 2018. But for that legal error, AV contends, it would not have been forced to invite the jury to find in Bavely's favor.

We find no reason to reverse on any of those grounds. By asking the jury to find for Bavely on his breach-of-contract counterclaim, AV approbated. AV necessarily took the position that *it* had violated the operating agreement and that Bavely had not. AV cannot now reprobate by asking that we undo the loss it asked for and revive its claim that Bavely breached first. The trial court properly let the plea-in-bar jury resolve the close call of whether Bavely's alleged breach of fiduciary duty was continuing or recurring. Because the jury found the violation continuing, the trial court properly dismissed the breach-of-fiduciary-duty claim as time-barred. We also find no error in the trial court's refusal to shift attorney fees. It is true that Bavely prevailed on his breach-of-contract counterclaim, winning a sizable judgment. But the parties eschewed a count-by-count approach, asking the court to determine prevailing-party

status using the gestalt approach. On that framing, we find no abuse of discretion in the trial court's determination that the result was a wash, with neither side prevailing over the other.

We thus affirm the judgment. And recognizing that our decision may not end this longstanding litigation, we revise one prior ruling in this case to clarify Bavely's right to seek additional security to suspend execution of the judgment pending appeal.

BACKGROUND

The sprawling litigation that produced this appeal involved multiple cases and related parties.[2] The trial court consolidated this case for a jury trial with seven other cases. We limit our discussion of the facts to those relevant to this appeal.

Robert M. Rosenthal cofounded Rosenthal Automotive in 1954 and oversaw its expansion throughout the D.C. metropolitan region.[3] The business was family-oriented from the start. Rosenthal's father was a cofounder, and his cousins and other relatives worked for the companies. Rosenthal expressed at least some desire to keep the business within the family. But non-family members also worked for the company, including Bavely, who started as an accountant in 1982. He rose through the ranks, first becoming chief financial officer and then president in 2001. As part of his compensation, Bavely received an equity interest in many of the organization's dealerships. When Rosenthal's health began to decline in 2005, he stepped back from his role in the companies and passed more responsibilities to Bavely.

---

[2] See *Bavely v. Geneva Enters., Inc.*, CL-2017-17979; *RBD of Virginia, LLC d/b/a Rosenthal Landmark Honda v. Bavely*, CL-2018-11424; *Bavely v. Geneva Enters., Inc.*, CL-2018-13979; *Geneva Enters., Inc. v. Bavely*, CL-2018-18124; *Bavely v. Jaguar Land Rover of Chantilly, LLC*, CL-2019-13200; *Bavely v. DealerPPC, LLC*, CL-2020-7497; *Bavely v. Fairfax Imports, Inc.*, CL-2020-18470.

[3] "Rosenthal Automotive" is a fictitious name used by the parties to describe the broad umbrella of Rosenthal's companies. AV is one of the companies within the organization and functions as a parent company to three car dealerships. Bavely worked directly for Geneva Management, one of those companies.

In 2009, Rosenthal and Bavely invested in AV. AV's operating agreement contained restrictions on its members' ability to transfer their equity interest. In relevant part, § 10.04 provided that:

> [o]ther than as set forth in Sections 10.02 and 10.03 no Member shall transfer or dispose of any portion of his membership interest in the Company except as follows:
>
> If a Member (a "Selling Member") during his lifetime desires to dispose of all or any portion of his Ownership interest in response to an offer from one who is not a Member, such Selling Member shall give notice to the remaining Members (the "Non-Selling Members") of such proposed distribution, which notice shall be accompanied by detailed information about the consideration and terms for such disposition (the "Disposition Notice"). By notice to the Selling Member within thirty (30) days following the Disposition Notice (the "Disposition Notice Period") any Non-Selling Member may: . . . (ii) require the Selling Member to first offer to sell all of the Selling Member's Interest to the Non-Selling Member who exercises this right of first refusal at a price and upon terms equal to the offer from the third party. . . .

Section 10.08 of the agreement provided that "[a]ny transfer or other action in violation of this Article shall be void *ab initio* and of no force or effect whatsoever." Section 12.01 provided that in "an action to enforce any provisions of [the] Operating Agreement against the Company or any other Member, . . . the prevailing party shall be entitled . . . to collect from the non-prevailing party . . . reasonable attorney[] fees and court costs."

A 2009 letter between the AV buyers and sellers proposed upper limits on the buyers' compensation. Bavely would receive as managing member an "equitable compensation plan, not to exceed $20,000 [per] month." The letter authorized Rosenthal and Bavely to receive a minimum management fee of $15,000 per month. Bavely received $20,000 per month in salary from AV beginning in the first quarter after the purchase. RBD, another Rosenthal company, was set up to receive the buyers' management fees. AV paid RBD the management fees yearly using a fixed formula.

In 2014, Bavely sold a portion of his membership interest in AV to his fiancée, Sarah Kee, and to trusts for Kee's two children (the "Kee Trusts"); the transfer amounted to 1.54% of the company.[4] The 2014 transfer reduced Bavely's equity interest in AV from 23.5% to 21.96%. Bavely did not notify AV's other members of the transfer or provide them with a right of first refusal. Kee and the Kee Trusts began receiving distributions from AV commensurate with the interests transferred by Bavely.

In September 2017, the other members of AV—relatives of Rosenthal—fired Bavely and removed him from AV's board. They accused him of self-dealing by paying himself a "big salary" and by receiving management fees. AV stopped paying Bavely entirely. In June 2018, AV purported to carry out a forced buyout of Bavely's entire membership interest in AV, citing his failure in 2014 to give notice of his transfer to Kee and the Kee Trusts. AV interpreted the operating agreement to allow it to acquire Bavely's entire equity interest on account of his alleged breach of the notice requirement. AV valued Bavely's total equity interest at $2,350,000 (including the transferred portion), using the per-share price reflected in Bavely's transfer to Kee and the Kee Trusts. AV sent Bavely a check in that amount and then redistributed Bavely's entire equity interest to the remaining members. Bavely refused to cash the check.

In February 2019, AV and its members sued Bavely, Kee, and the Kee Trusts. AV's first complaint contained the two claims at issue in this appeal, count 5 (accusing Bavely of breaching the operating agreement by failing to provide notice or right of first refusal before the transfer to Kee and the Kee Trusts); and count 7 (accusing Bavely of alleged conversion of his salary and the management fee). Bavely demurred to AV's count 5, arguing that it failed to state a breach-of-contract claim. He reasoned that the notice provision was not triggered because he never

---

[4] Kee was one of the defendants sued by AV in the trial court. AV has not challenged the judgment in Kee's favor.

received "an offer" from Kee under § 10.04 to sell his interest to her; he transferred the interest on his own initiative. And even if he had breached the operating agreement by failing to give notice of the transfer, Bavely reasoned that AV was not harmed because § 10.08 rendered the transfer "void *ab initio*." AV countered that Bavely's failure to give notice of the transfer sufficed, at least at the demurrer stage, to allege a breach of contract.

The trial court sustained Bavely's demurrer "to the extent that [AV sought] damages beyond the value of the interest improperly transferred." The court rejected Bavely's "no offer" theory, reasoning that the notice requirement in § 10.04 would be triggered any time a sale or transfer occurs. The court interpreted § 10.04 to provide, at most, for the forced buyout of only the equity interest that Bavely had attempted to transfer to Kee and the Kee Trusts. The court granted leave for AV to amend the complaint to argue that Bavely's failure to provide notice could still have resulted in at least some damages.

AV moved for reconsideration, arguing that the court misinterpreted § 10.04. AV attached declarations from the two original members of AV. Both claimed it was their understanding that § 10.04 permitted the members to buy the breaching member's entire equity interest upon a breach of the notice and right-of-first-refusal requirement.

In its order resolving that motion, the court found the operating agreement unambiguous, making AV's parol evidence inadmissible. But the court granted the motion in part to provide an additional basis for its ruling. The court concluded that § 10.08's focus on voiding only the transfer of equity meant that any damages under § 10.04 would be limited to that portion as well.

In its second amended complaint, AV repleaded count 5. AV recast count 7 as a breach-of-fiduciary-duty claim that Bavely had improperly taken a salary and received management fees from AV.

Bavely filed a plea in bar, arguing (among other things) that the breach-of-fiduciary-duty claim in count 7 was barred by the two-year statute of limitations in Code § 8.01-248. He reasoned that any alleged misconduct in his payment structure amounted to a continuous violation that began before February 2017, so the cause of action accrued more than two years before the suit was filed.

The trial court conducted a jury trial on the plea in bar.[5] AV moved to strike the plea at the close of Bavely's case and again at the close of all the evidence. AV argued that the two-year statute of limitations did not apply to claims for payments made within the two-year window before it sued him in February 2019. The court denied the motion to strike, saying that the issue required "evidence weighing" by the jury.

The court instructed the plea-in-bar jury to assume that AV's breach-of-fiduciary-duty claims were true; the jury's job was to decide if the claims against Bavely "were filed in a timely manner." The jury was told that "[t]he statute of limitations for breach of fiduciary duty is two years" and "began to run when Mr. Bavely breached a fiduciary duty and an injury or damage was sustained." The jury was also instructed on the difference between a continuing breach and a recurring one:

> The statute of limitations begins to run on the date the injury or breach occurs. Subsequent, compounding or aggravating damage—if attributable to the original act—does not restart a new limitation period for each increment of additional damage.
>
> When wrongful acts are not continuous but occur only at intervals, each occurrence inflicts a new injury and a new statute of limitations begins to run for each new and separate act that causes injury.

---

[5] The plea-in-bar trial lasted a week and addressed statute-of-limitations issues not only in this case but in three related cases. *See* note 2 *supra*.

The jury was further instructed that Bavely bore the burden of proving his statute-of-limitations defense by a preponderance of the evidence and that Bavely could not prevail based solely on his uncorroborated testimony.

The jury returned a verdict on special interrogatories, concluding that all of AV's breach-of-fiduciary-duty claims in count 7 were untimely, including its claim based on Bavely's paying himself an annual salary of $240,000 and causing AV to pay management fees to RBD. So the trial court sustained the plea in bar and dismissed count 7.

In March 2022, AV filed its 14-count third amended complaint. The complaint restated AV's counts 5 and 7 in substantially the same form as before. The trial court treated AV's repleaded count 7 as "an overinclusive effort to preserve its objection for appeal," confirming the entire count was dismissed. In his 12-count third amended counterclaim, Bavely alleged in count 4 that AV had breached the operating agreement by forcing him out of the company, entitling him either to an injunction that he be restored to his 21.96% ownership position or be paid damages of $30 million. Bavely also alleged in count 11 that (on the assumption that he remained a member of AV after the attempted ouster) he was entitled to damages of $25 million for the cash distributions that AV had failed to pay him since ousting him. Bavely also requested his attorney fees under § 12.01 of the operating agreement.

The trial court reserved ruling on the parties' equitable claims until after the jury trial on their legal claims. The 43-day jury trial began on August 3 and did not finish until November 2, 2022.[6] On October 17, Bavely moved to strike what remained of AV's count 5. He argued, based on the court's earlier rulings, that his attempted stock transfer to Kee and the Kee Trusts was voided under § 10.08 for lack of notice to the other members; and since the transfer was voided, it could not have triggered any right under § 10.04 for the other members to force him to

---

[6] The trial was consolidated with the trials of six related cases. *See* note 2 *supra*.

sell his entire equity interest to them.  Thus, AV suffered no damages from the ineffective transfer and had no ground to sue.

The trial court held to its previous interpretation of the operating agreement.  Although agreeing that Bavely violated the operating agreement by failing to give notice of the transfer to the other members, the court found that the transfer was void and that AV, accordingly, could not prove any damage.

At the charging conference, the court barred AV from making arguments to the jury that were inconsistent with the court's interpretation of §§ 10.04 and 10.08 of the operating agreement.  Still, the court permitted AV "to argue to the jury that it is not liable for breach of contract because Bavely was the first to materially breach the contract."  Thus, count 5 still provided a viable breach-of-contract theory, though in a truncated form compared to the original.

In closing argument, AV's counsel initially pursued that theory by asking the jury to reject Bavely's claims.  It told the jury that Bavely had "committed the first material breach" of the operating agreement, arguing that his transfer of shares to Kee and the Kee Trusts without notice violated § 10.04.

But then AV suddenly reversed positions, asking the jury to return its verdict for Bavely on count 4 of his counterclaim.  AV explained that this would create a "clean break" between Bavely and AV by buying him out of the company, rather than treating him as if he were still a member entitled to back-salary and distributions.  AV added that a verdict for Bavely on counterclaim count 4 meant the jury should return its verdict against him on counterclaim count 11, in which Bavely sought unpaid distributions.  AV explained, "If Mr. Bavely gets distributions, then he's also still a member, and the company still has to deal with Mr. Bavely . . . .  So instead of asking you to award nothing to Mr. Bavely, we are asking you to award the buyout."  AV reiterated that it was asking the jury for a "clean break," "a buyout but

- 10 -

not distributions." It encouraged the jury to award "a reasonable fair market value" for the buyout, which AV estimated to be $14,103,000. AV's counsel told the jurors that asking for judgment against his client might "come as a surprise" to them. It was "the first time" he had "ever been on a case where someone has had a claim against me and [I]'ve said that you should put a yes. But we think it's the right thing to do."

The jury did what AV asked. It found in favor of Bavely on counterclaim count 4, awarding him $17,654,445 in compensatory damages for his separation from AV. It found against him on counterclaim count 11. The jury found against all parties on all other claims, including AV's breach-of-contract claim in count 5.

The trial court then addressed Bavely's requests for equitable relief. The court found that the jury's damages verdict on counterclaim count 4 provided Bavely an adequate remedy at law for his ouster from AV, making additional equitable relief inappropriate. The court added that "placing Bavely back in AV Automotive [would] be the most disruptive thing the Court could do to the company. It would amount to a complete leadership change, which is inherently disruptive." It would be "even more" disruptive because Bavely had "been absent from the car dealership industry—and employment generally—for years." The court found "no persuasive evidence he is now up to the task of running AV Automotive—especially in the form of what amounts to a hostile takeover." So the court denied Bavely's requests for back-pay and reinstatement.

Both sides moved for attorney fees, claiming the "prevailing party" mantle under the counts that sought to enforce the operating agreement.[7] Each side framed the prevailing-party test as measured by that side's success considering the totality of the case. Bavely claimed

---

[7] The parties had earlier agreed to bifurcate their attorney-fee claims for resolution after the merits trial. *See* Rule 3:25(d).

victory because he forced AV to choose between two losing options, paying Bavely or reinstating him. AV claimed victory because it defeated most of Bavely's claims and, most importantly, prevented him from being reinstated or taking over the company under a separate "death option" contract he had with Rosenthal. AV argued that the jury had accepted its clean-break request. AV said that it was "very happy with the verdict" and that its principals all "fe[lt] like they absolutely prevailed."

The court declined to shift any fees. Accepting the parties' holistic framing of § 12.01 of the operating agreement, the court said that, "[i]n determining who prevailed, this Court considers the general result and inquires as to who ultimately succeeded writ large." The court found that "neither party in this matter is the prevailing party, because both sides lost more than they desired to gain."

Bavely and AV each filed a timely notice of appeal, and we consolidated the appeals for argument.

ANALYSIS

In Record No. 2168-23-4, AV seeks a new trial on its breach-of-contract claim in count 5 and on Bavely's breach-of-contract counterclaim in count 4. AV argues that the trial court should have found as a matter of law that when Bavely breached the operating agreement by failing to give notice of his 2014 transfer to Kee and the Kee Trusts, the other members properly bought out Bavely's entire interest. AV also seeks a new trial on its breach-of-fiduciary-duty claims in count 7, which the plea-in-bar jury found to be time-barred. AV argues that the trial court should have struck Bavely's plea and should have allowed AV to seek damages at trial for recurring breaches that occurred within the two-year limitations period preceding AV's lawsuit. In Record No. 2165-23-4, Bavely seeks his attorney fees under the operating agreement for having prevailed on counterclaim count 4.

*A. The approbate-reprobate doctrine bars AV's efforts to relitigate count 5 and Bavely's counterclaim count 4 (AV Assignments of Error 1-3).*

"A litigant cannot 'approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory,' or else such arguments are waived." *Amazon Logistics, Inc. v. Va. Emp. Comm'n*, ___ Va. ___, ___ (Mar. 6, 2025) (per curiam) (quoting *Rowe v. Commonwealth*, 277 Va. 495, 502 (2009)). "To approbate is '[t]he act of formally or authoritatively declaring something to be proper, commendable, or good.'" *Commonwealth v. Holman*, 303 Va. 62, 73 (2024) (alteration in original) (quoting *Approbate*, *Black's Law Dictionary* (11th ed. 2019)). To reprobate means "to disapprove of: reject as unworthy." *Id.* (quoting *Reprobate*, *Webster's Third New International Dictionary* (2002)). The approbate-reprobate doctrine "applies to all litigants," and it "applies both to assertions of fact and of law." *Id.* at 71. The doctrine "forces a litigant to elect a particular position[] and confines a litigant to the position . . . first adopted." *Id.* (quoting *Matthews v. Matthews*, 277 Va. 522, 528 (2009)). The doctrine "'is broader and more demanding than' the rules of procedural default." *Id.* at 72 (quoting *Alford v. Commonwealth*, 56 Va. App. 706, 709 (2010)). Courts do not apply the approbate-reprobate doctrine at a "granular level"; they look instead to "confin[e] a litigant to a particular position." *Id.* at 74.[8]

AV approbated when it asked the jury to return its verdict for Bavely on count 4 of his counterclaim, giving AV a "clean break" by effecting a buyout of Bavely's interest in the company. AV's counsel told the jury that "we think it's the right thing to do." AV thus declared that result to be "proper, commendable, or good." *Holman*, 303 Va. at 73 (citation omitted).

---

[8] The approbate-reprobate doctrine has "ancient roots." *Holman*, 303 Va. at 71 (quoting *Wooten v. Bank of Am., N.A.*, 290 Va. 306, 309-10 (2015)). The doctrine first appeared in *Heth v. Commonwealth*, 126 Va. 493 (1920), where the Court embraced "the sententious and comprehensive expression of the Scotch law, 'A man shall not be allowed to approbate and reprobate,'" *id.* at 498. *See, e.g.*, *Fairie v. Watson*, 2 Paton 213, 213 (H.L. 1770) (from Scotland) (holding that claimant could not "approbate and reprobate the same deed").

After the jury gave AV what it asked for, AV now reprobates by seeking to invalidate the judgment altogether based on Bavely's alleged breach of contract, a claim that AV necessarily abandoned when it invited judgment against itself on counterclaim count 4. AV's actions are plainly strategic. Having eliminated the risk that Bavely might be reinstated to the company, AV wants a do-over on Bavely's breach-of-contract claim in the hope of having to pay nothing for Bavely's ouster. AV is thus "'blowing hot and cold' depending on [its] perceived self-interests." *Id.* at 71 (quoting *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 204 (2016)).

AV argues that it did not approbate by inviting judgment against itself on counterclaim count 4 because AV never admitted that *it* had breached the operating agreement when it attempted the forced buyout of Bavely's interest. AV insists that it has been consistent in its position that Bavely breached first.

But what AV did here is no different in kind from the defendant's strategy in *Holman*, where "the error the defendant complains of on appeal is 'obviously the result of his own strategy and actions at trial.'" *Id.* at 72 (quoting *Rowe*, 277 Va. at 502). Holman shot his girlfriend in the face with a shotgun and was tried on charges of aggravated malicious wounding, using a firearm to commit a felony, discharging a firearm in a public place, and possessing a firearm as a convicted felon. *Id.* at 67-68. The aggravated malicious wounding charge carried "a possible life sentence." *Id.* at 68. To avoid a conviction on that charge, Holman argued on his motion to strike that he did not act with the requisite malice and that the evidence established "[a]t best" that he committed only unlawful wounding. *Id.* at 69. Holman did not challenge the other counts. *Id.* at 69. The trial court granted his motion to strike the aggravated malicious wounding charge but allowed the Commonwealth to proceed on the unlawful wounding charge. *Id.* Holman then immediately pleaded guilty to unlawful wounding and to the remaining charges. *Id.* After sentencing, Holman appealed his conviction on the felon-in-possession

charge, pointing out (correctly) that the statute did not permit a conviction for the predicate offense of unlawful wounding. *Id.* at 70. The Supreme Court applied the approbate-reprobate doctrine to bar Holman from challenging his guilty plea on that conviction. *Id.* at 72-76.

Similar to AV here, Holman argued that he did not approbate in the trial court because he had never "specifically stipulated" to the underlying evidence. *Id.* at 73-74. But the Court rejected that "granular" approach, explaining that the approbate-reprobate "doctrine does not turn on whether a litigant has made a specific stipulation. Instead, we have described the doctrine as confining a litigant to a particular position." *Id.* at 74. Likewise, it does not matter that AV never stipulated that *it* breached the operating agreement and that Bavely did not. For just as in in *Holman*, that was effectively the position AV took by inviting judgment against itself on Bavely's counterclaim count 4, thereby executing AV's "overarching strategy," *id.* at 73, to exclude Bavely from the company.

We disagree with AV that the trial court's earlier rulings forced AV to do that. AV could have stood on its interpretation of the buyout provision and appealed the adverse ruling after a final judgment. Moreover, the trial court did not take away AV's first-breach argument. The court allowed AV to defend against Bavely's counterclaim by arguing that Bavely had committed the first breach in transferring a portion of his interest to Kee and the Kee Trusts without notice to the other members. AV could have taken its chances with the jury on that defense. Instead, AV abandoned that option to achieve what it wanted from the outset: Bavely's forced buyout.

Indeed, AV boasted at the attorney-fee hearing that its gambit had paid off. AV succeeded in defeating Bavely's "very valuable claims," including his claim for past distributions that alone "incredibly dwarf[ed] the $17.6 million that he was awarded for the value of his shares." AV insisted that the jurors gave AV what it "asked them to award"; AV said that

its principals were "very happy with the verdict. They feel like they absolutely prevailed in this case." Without question, AV's trial strategy proved highly successful. But AV cannot now disavow it.

We also reject AV's argument that the approbate-reprobate doctrine holds a party only to the "first" position it adopted, not its second position. AV insists that its position on appeal here is consistent with its first position at trial. But AV has not cited any case where a party that prevailed on its second position was allowed to U-turn back to its original position. Our appellate courts, by contrast, have condemned that practice. In *Babcock*, the Supreme Court applied the approbate-reprobate doctrine to hold the appellant—not to its initial position in the trial court—but to the second position it assumed at trial. 292 Va. at 203. Arguing its second position to the jury, the appellant "succeeded in obtaining a jury verdict." *Id.* at 204. The Court said that allowing the appellant "to disavow on appeal the very argument it made at trial would allow [it] to approbate and reprobate." *Id.* Similarly, we found in *Cody v. Commonwealth*, 68 Va. App. 638 (2018), that the appellant had taken one position in the trial court, later abandoned it, and then tried to reprise his first position on appeal. *Id.* at 665. We applied the approbate-reprobate doctrine to deem his flip-flop a waiver of the argument. The same is true of AV's about-face here. Having invited the jury to render its verdict for Bavely and against AV on counterclaim count 4, AV has waived its right to seek a new trial on that count.

The approbate-reprobate doctrine likewise bars AV's request for a new trial on its own breach-of-contract claim in count 5. That count alleged that Bavely breached the operating agreement by trying to sell a portion of his equity interest to Kee and the Kee Trusts without notice to the other members, resulting in damages to AV of $8.5 million. 3d Am. Compl. ¶¶ 155-56. But by inviting judgment against itself on counterclaim count 4, AV necessarily conceded that Bavely had *not* breached the operating agreement. Accordingly, AV took a

- 16 -

position directly at odds with the premise of count 5. So AV is now barred from changing positions to argue that Bavely actually did breach the operating agreement.

### B. The trial court properly submitted the timeliness of AV's breach-of-fiduciary-duty claim to the plea-in-bar jury (AV Assignment of Error 4).

AV alleged in count 7 of the second amended complaint that Bavely, as a member, manager, and president of AV, breached his fiduciary duties to AV by paying himself a salary of "$240,000 a year," 2d Am. Compl. ¶¶ 68, 169, and by paying a "management fee" to RBD, an entity that he and Rosenthal owned equally, *id.* ¶ 69. AV claimed that Bavely's "September 2014" breach of the operating agreement meant that he "was not entitled to receive this salary as of that date." *Id.* ¶ 68. AV similarly alleged that Bavely's breach of the operating agreement terminated his entitlement to the management-fee proceeds, so he was not entitled to the $2.5 million he was paid "[f]rom September 2014 until his termination in September 2017." *Id.* ¶ 69. AV sought compensatory damages of $8,487,540. *Id.* ¶ 175.

Bavely responded with a plea in bar based on the statute of limitations, and the plea was tried before a jury. As noted above, the jury was instructed that the limitations period for a breach-of-fiduciary-duty claim is two years and "began to run when Mr. Bavely breached a fiduciary duty and an injury or damage was sustained." The jury was also instructed on the difference between a continuing and recurring breach. The jury concluded that all of AV's breach-of-fiduciary-duty claims were time-barred, including its claims based on Bavely's receiving a salary and management fees.

On appeal, the parties agree that the two-year catch-all limitations period in Code

§ 8.01-248 applies to breach-of-fiduciary-duty claims.[9]  They also agree that the cause of action

accrues when the breach of duty occurs and an injury or damage is sustained.[10]

But the parties part company on whether the breach of fiduciary duty alleged here was

continuous such that the entire claim accrued at the outset and had to be brought within two

years.  AV maintains that Bavely's breach of fiduciary duty occurred every time he paid himself.

So AV argues that the trial court should have denied the plea in bar to allow AV to sue for

moneys paid to Bavely during the two-year window preceding the lawsuit.  Bavely responds that

his receiving a quarterly salary and regular management fees stemmed from the original

agreement to pay them.  So if that was a breach of fiduciary duty, it was a "continuous breach,"

requiring AV to bring suit within the limitations period following the initial breach and resulting

damage.  Bavely maintains that the trial court could have decided this issue in his favor as a

---

[9] We accept the parties' concession of law "as a basis for not deciding," *Logan v. Commonwealth*, 47 Va. App. 168, 172 n.4 (2005) (en banc), whether Code § 8.01-248 applies to breach-of-fiduciary-duty claims.  Our appellate courts have not yet answered that question in a precedential opinion.  *But see Singer v. Dungan*, 45 F.3d 823, 827 (4th Cir. 1995) ("We have ruled repeatedly that under Virginia law a breach of fiduciary duty claim is subject to the . . . limitations period of § 8.01-248.").

[10] We rely on that concession as well, *see* note 9 *supra*, as our appellate courts have also not yet decided whether a breach-of-fiduciary-duty claim accrues when the damage results or "when the breach of contract occurs in actions ex contractu."  Code § 8.01-230.  *Compare Safe Haven Wildlife Removal & Prop. Mgmt. Experts, LLC v. Meridian Wildlife Servs. LLC*, 716 F. Supp. 3d 432, 442 (W.D. Va. 2024) ("accrues *at the time of the breach*"), *and Jones v. Shooshan*, 855 F. Supp. 2d 594, 603 (E.D. Va. 2012) (same), *with Rossmann v. Lazarus*, No. 1:08cv316, 2009 U.S. Dist. LEXIS 1741, at *23 (E.D. Va. Jan. 9, 2009) ("on the date the plaintiff is injured"), *Tabler v. Litton Loan Servicing, LP*, No. 3:09-CV-146, 2009 U.S. Dist. LEXIS 70768, at *9 (E.D. Va. Aug. 12, 2009) (same), *and Katz v. Holland & Knight LLP*, No. 1:08cv1137, 2009 U.S. Dist. LEXIS 10721, at *19 (E.D. Va. Feb. 12, 2009) (same).  *See also Thorsen v. Richmond SPCA*, 292 Va. 257, 278-79 (2016) ("Code § 8.01-246 can, under the proper circumstances in which no injury is sustained, provide one of the referenced statutory exceptions to the rule set forth in Code § 8.01-230 that contractual rights of action accrue at breach.").

matter of law. But at the very least, he says, the trial court did not commit reversible error by letting the plea-in-bar jury decide that AV's claim was untimely.

In reviewing whether the trial court erred in denying AV's motion to strike, we take the evidence in the light most favorable to Bavely, the non-moving party. *See Egan v. Butler*, 290 Va. 62, 73 (2015). He "must be given 'the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'" *Id.* (quoting *Hadeed v. Medic-24, Ltd.*, 237 Va. 277, 281 (1989)). As applied to this context, the standard of review permits us to find error in refusing to strike the plea in bar only if (1) it was "conclusively apparent" that the statute-of-limitations plea had to be overruled, or (2) the trial judge would have been "compelled to set aside any verdict" for the non-moving party "as being without evidence to support it." *Id.* (quoting *Blue Ridge Serv. Corp. v. Saxon Shoes, Inc.*, 271 Va. 206, 218 (2006)).

AV has failed to satisfy that standard. To show why, we first set the stage by explaining how Virginia's version of the continuing-violation doctrine differs from the approach in other jurisdictions. We then show that while a court can sometimes determine as a matter of law that a breach is continuing or recurring, the gray area in between those two scenarios can require the sort of factfinding performed by the plea-in-bar jury here.

In about a half-dozen States (think of this as "Model 1"), "courts have recognized or applied the rule that where a tort involves a continuing or repeated injury, such as continuing nuisance or trespass, the action accrues and the statute of limitations does not begin to run until the date of the last injury or when the tortious acts cease." Eric C. Surette, Annotation, *Accrual of Claims for Continuing Trespass or Continuing Nuisance for Purposes of Statutory Limitations*, 14 A.L.R.7th art. 8, §§ 2 & 8 (2016 & Supp. 2024) (collecting cases). In about two-thirds of the States ("Model 2"), "the general rule is that every repetition . . . is a separate wrong subject to a new and separate limitation period, for which the person injured may bring

- 19 -

successive actions for damages until the nuisance or trespass is abated even though the action based on the original wrong may be barred." *Id.* §§ 2 & 4-5 (collecting cases). But in a small number of States ("Model 3"), "when a trespass or interference originates, the cause of action has accrued, and the statute of limitations begins to run notwithstanding a claim that the trespass is a continuing tort that causes ongoing injury." *Id.* §12.[11]

One consequence of these different approaches is the confusion that can result from referring to this doctrine generically as the *continuing-tort doctrine* or the *continuing-violation doctrine*. What that means for accrual varies dramatically among Model 1, 2, and 3 jurisdictions. In Model 3 jurisdictions, a claim for a continuing violation will be time-barred if it was not brought within the limitations period after the claim first accrued. In Model 2 jurisdictions, the claim will be time-barred only to the extent of the claims falling outside the limitations period preceding suit. And in Model 1 jurisdictions, the claim will not be time-barred so long as it is brought within the limitations period following the last injury. *See, e.g.*, *id.* ("Under the continuing tort doctrine, where a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease." (abstract)); Kyle Graham, *The Continuing Violations Doctrine*, 43 Gonzaga L. Rev. 271, 272-73 (2007) ("The basic theory behind the continuing violations doctrine is [that] . . . [i]n some situations, continuing misconduct by a defendant will justify the aggregation or parsing of its misbehavior, with the effect of rescuing a plaintiff's claim or claims from the statute of limitations.").

Virginia is a Model 3 jurisdiction. *See Forest Lakes Cmty. Ass'n v. United Land Corp. of Am.*, 293 Va. 113, 126-27 (2017). The Court in *Forest Lakes* traced our version of the

---

[11] Surette's annotation identifies additional variations on these approaches. *See* Surette, *supra*, § 2.

continuing-violation doctrine to *Virginia Hot Springs Co. v. McCray*, 106 Va. 461 (1907). *Id.* at 125-27. In *Virginia Hot Springs*, the defendant built and operated a large resort that discharged untreated sewage into a stream, spoiling the downstream plaintiff's water supply. 106 Va. at 463. The plaintiff alleged that the defendant's sewage system "was of a permanent character, and from its construction the pollution of the Hot Springs Run . . . began and has continued." *Id.* at 473-74. The trial court struck the defendant's plea in bar, which relied on the five-year statute of limitations. But the Supreme Court reversed, holding that the plea sufficiently alleged that the tort was continuous in nature, remanding the case for a new trial on whether the statute of limitations therefore barred the claim. *Id.* at 466, 475.

> *Forest Lakes* summarized the continuing-violation doctrine this way:

> [W]hen the recurring injuries "in the normal course of things, will continue indefinitely, there can be but a single action therefor, and the entire damage suffered, both past and future, must be recovered in that action," and as a result, "the right to recover will be barred unless it is brought within the prescribed number of years from the time the cause of action accrued." . . . In this scenario, the limitation period runs from the start of the continuous and indefinite injury not the end of it.

293 Va. at 126-27 (quoting *Norfolk Cnty. Water Co. v. Etheridge*, 120 Va. 379, 380-81 (1917)). By contrast, "temporary or recurring nuisances" receive different statute-of-limitations treatment. *Id.* at 124-25 (quoting 1 James H. Backman et al*., A Practical Guide to Disputes Between Adjoining Landowners—Easements* § 9.04[3][a], at 9-64 to -67 (2016)). In those cases, "a new cause of action . . . accrue[s] that looks remarkably like an earlier one but is nonetheless a standalone claim in its own right. When this occurs, the damage accompanying the new cause of action sets new accrual starting blocks for a separate limitation period." *Id.* at 124.

> *Forest Lakes* explained that the choice among accrual rules in continuing-violation cases is not governed by the common law of England, which generally provides the rule of decision in Virginia unless changed by the General Assembly. *See id.* at 132 (citing Code § 1-200). A

- 21 -

statute of limitations is just that: "a *statute*—not a principle of common-law . . . . 'There was no such thing,' after all, 'as a limitation of actions at common law.'" *Id.* (emphasis added) (quoting *Johnson v. Merritt*, 125 Va. 162, 175 (1919)). *Forest Lakes* acknowledged that (what we are calling here) the Model 3 version of the continuing-violation doctrine differs from the rule in other jurisdictions. *Id.* at 133 (attributing to Colorado the Model 1 rule that "no limitation period should ever run until the continuing trespass or nuisance ceases altogether"). But the Court said that its "view to the contrary . . . has been the law of this Commonwealth for over a century," and the Court was "confident that the General Assembly by now would have corrected any misinterpretation of the statute of limitations on our part if, indeed, there were one." *Id.*

Regardless of which model applies, distinguishing between continuing and recurring violations "has frustrated judges and litigants for many years, for it has proven exceedingly difficult to determine which claims are 'continuing' in nature, and which are not." Graham, *supra*, at 273. "Contemporary courts have disagreed about whether or how the continuing violations doctrine should apply to claims alleging civil conspiracy, trespass, nuisance, and other torts, in addition to suits brought under civil rights, copyright, and environmental laws." *Id.* at 273-74 (footnotes omitted). Indeed, our Supreme Court recognized in *Forest Lakes* that for more than a century, our precedents have reflected "'confusion . . . aris[ing] not so much from the statement of governing principles as from the inherent difficulty' in applying these principles to the multitude of unique circumstances in which such cases arise." 293 Va. at 128 (quoting *Norfolk & Western Ry. Co. v. Allen*, 118 Va. 428, 434-35 (1916)).[12]

---

[12] "Nearly every writer who addresses the continuing violation doctrine characterizes it as confusing, incoherent, and inconsistent." Elad Peled, *Rethinking the Continuing Violation Doctrine: The Application of Statutes of Limitations to Continuing Tort Claims*, 41 Ohio N. Univ. L. Rev. 343, 346 (2015). *See also* Surette, *supra*, § 2 ("[C]lear-cut distinctions between permanent and temporary nuisances are elusive at best . . . .").

Still, courts can sometimes distinguish a continuing violation from a recurring one as a matter of law. In *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543 (1989), the Court set aside a jury verdict for a shopping-center tenant and entered final judgment for the landlord based on the statute of limitations. *Id.* at 549. The Court found as a matter of law that the shopping-center tenant's breach-of-contract claim accrued when the commercial landlord first breached its lease obligation to require other tenants to observe uniform hours of operation. *Id.* at 547-48. It did not matter that the landlord had repeatedly assured the plaintiff that it would enforce that obligation and then failed to do so. *Id.* at 545. The Court rejected the tenant's and the trial court's theory that "a new five-year limitation period began to run each day the lease provision was breached." *Id.* at 544.

In a nonprecedential case, the Court similarly determined as a matter of law that the trial court properly sustained a statute-of-limitations plea. *Gadams v. Nolde Bakery Condo. Ass'n*, Nos. 180397, 180398, 2019 Va. Unpub. LEXIS 4 (Feb. 28, 2019) (per curiam). The plaintiffs there alleged that, beginning in 2006, the defendants—directors of a condominium association—breached their fiduciary duties because they "failed to maintain adequate reserves and failed to levy sufficient assessments 'during all of the time' [they] served on the Board." *Id.* at *13. The Court affirmed the trial court's holding that the lawsuit was untimely under *Forest Lakes*. *Id.* at *14. The Court said that the directors' "alleged failures continued throughout the entire time [they] served on the Board. Because damage—operating losses and inadequate reserves—occurred in 2006, the statute of limitations began running in 2006, more than two years before the complaint was filed." *Id.*

The Fourth Circuit, applying Virginia law, similarly determined that a subcontractor's breach-of-contract claim against its general contractor was time-barred. *See Fluor Fed. Sols., LLC v. PAE Applied Techs., LLC*, 728 F. App'x 200 (4th Cir. 2018) (per curiam). The parties in

- 23 -

*Fluor* disputed whether the subcontractor had agreed to a 2.3% cap on general-and-administrative costs ("G&A"). *Id.* at 201. Although initially abiding by the cap, the subcontractor began in January 2004 to submit invoices with G&A amounts exceeding the cap. For nearly 12 years while the project was underway, until the subcontractor finally sued, the general contractor refused to pay the higher amounts. *Id.* at 202. The Fourth Circuit found the lawsuit untimely, correctly describing Virginia's version of the continuing-violation doctrine:

> In cases like this in which an alleged breach spans an extended period of time, courts have distinguished between acts that constitute a "single contin[uous] breach" and those that constitute a "series of separate breaches." *Am. Physical Therapy Ass'n v. Fed'n of State Bds. of Physical Therapy*, 271 Va. 481, [484 (2006)]. A single continuous breach occurs when "the wrongful act is of a permanent nature" and "produces all the damage which can ever result from it." *Hampton Rds. Sanitation Dist. v. McDonnell*, 234 Va. 235, [239] ([]1987) (citation and internal quotation marks omitted). Conversely, when wrongful acts "occur only at intervals, each occurrence inflicts a *new injury* and gives rise to a new and separate cause of action." *Id.* (emphasis added).
>
> If the alleged breach is a "single continuous breach," the limitations period runs from the inception of that breach, even when the breach continues for years. *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543, [548] ([]1989) (rejecting the contention that "a new cause of action" occurred every day defendant breached contract during seven year period).

*Id.* (first alteration in original). Applying Virginia precedent, the court could "only conclude that [the subcontractor] assert[ed] a 'single continuous breach' . . . ." *Id.* at 203. So the claim was time-barred. *Id.*

Conversely, our Supreme Court found as a matter of law in *American Physical Therapy* that the plaintiff's breach-of-contract claims "constituted distinct, separate breaches of the Agreement." 271 Va. at 485. The contract required the defendant to establish prices for a national examination "that are generally consistent (taking inflation into account) with prior levels and which are not unduly burdensome to candidates." *Id.* at 483. The defendant increased

the fee in January 1995 from $90 to $185; it raised it again in July 2000, that time to $285. *Id.*
The plaintiff filed suit in November 2004. *Id.* The trial court sustained the defendant's plea of the five-year statute of limitations, concluding that all the claims were time-barred because the suit was not filed within five years of the 1995 fee increase. *Id.* at 484. The Supreme Court reversed, holding that the fee-setting provision "contemplates a distinct obligation that arises each time the Federation imposes a new fee." *Id.* at 485. So the plaintiff was "entitled to bring its claims for those breaches of contract that occurred in the five years preceding its filing of this suit." *Id.*

This does not mean that courts should always decide as a matter of law whether a tort or breach of duty is continuous or recurring. The relevant facts are often disputed, requiring the question to be submitted to the trier of fact. Thus, in *Virginia Hot Springs*, after holding that the trial court erred by striking the defendant's statute-of-limitations plea, the Court remanded the case for a new trial. 106 Va. at 475. The Court said that the jury should determine the "permanent character" or recurring nature of the injury:

> The question presented by the rejected plea is simply whether the injury is of a permanent character, resulting from a permanent structure, and *is a mere question of fact*, *which*, like all other alleged facts, *can be submitted to and decided by a jury*. The intention of the defendant in such a case is to be determined in the same way as it is to be determined in other cases, and there is no difficulty in determining it from the defendant's acts and the nature and purpose of the structure which caused the injury.

*Id.* at 471 (emphases added).

Similarly, the Court in *Forest Lakes* upheld the trial court's conclusion that the lawsuit was time-barred based on "ample" evidence that the defendant's "permanent sediment basins discharged into [the plaintiff's lake] on a continuous basis and that the five-year statute of limitations was not revived for any particular discharge episode." 293 Va. at 129. And in *Robinson v. Nordquist*, 297 Va. 503 (2019), the Court held that the limitations question could not

be resolved solely on the pleadings because the amended complaint called the water encroachments at issue there "'on-going,' and 'continuous,'" as well as "repeated and intermittent." *Id.* at 516. The trial judge thus erred in sustaining the statute-of-limitations plea because (among other things) "it [was] not clear from the face of the amended complaint . . . whether the water encroachments were continuous or intermittent." *Id.*

Viewing the evidence at the plea-in-bar hearing in the light most favorable to Bavely, we find no error in the trial court's decision to deny the motion to strike so the jury could determine whether the breach of fiduciary duty attributed to Bavely was continuous or recurring. Bavely testified that AV had paid him a quarterly salary from the very beginning in 2009. Bavely also received the management fee under "a formula that recurred year over year over year." Assuming for argument's sake that Bavely engaged in self-dealing by continuing to receive those payments, the plea-in-bar jury could readily conclude that Bavely intended from the outset to keep receiving those payments. The limitations period thus would have accrued when he wrongfully took the first payment—"the start of the continuous and indefinite injury." *Forest Lakes*, 293 Va. at 127.[13] In other words, the trial court properly denied the motion to strike the plea because it was not "conclusively apparent" that the statute-of-limitations plea had to be overruled, nor that the trial judge would be "compelled to set aside any verdict" for Bavely. *Egan*, 290 Va. at 73 (quoting *Hadeed*, 237 Va. at 218).

---

[13] *Indefinitely*, in this sense, "does not mean that the situation may be expected to last forever, but merely that there is no reason to expect its termination at any definite time in the future." Restatement (Second) of Torts § 930 cmt. b (1979).

*C. The trial court did not err in declining to award attorney fees (Bavely's Assignment of Error).*

Bavely appeals only the trial court's decision to deny him attorney fees, claiming he was the "prevailing party" in the litigation under § 12.01 of the operating agreement. That section provides:

> In the event any Member brings an action to enforce any provisions of this Operating Agreement against the Company or any other Member, whether such action is at law, in equity or otherwise, the prevailing party shall be entitled, in addition to any other rights or remedies available to it, to collect from the non-prevailing party or parties the reasonable costs and expenses incurred in the investigation preceding such action and the prosecution of such action, including but not limited to reasonable attorney[] fees and court costs.

Although they disagree about almost everything else, the parties agree on two things about this fee-shifting provision. First, they agree it permits fee shifting only for claims "to enforce" the operating agreement. They disagree, however, about which of the many counts in AV's lawsuit and Bavely's counterclaim qualify for fee shifting. AV identifies "21 fee-bearing claims." It says that "Bavely asserted all but one of them, and he lost all but one of the 20 he asserted." Bavely retorts that "all 14 of [AV's] claims that reached trial were fee-bearing."

Second, the parties agree that prevailing-party status should be determined based on the overall results on the fee-bearing claims, rather than by evaluating the parties' success or failure claim-by-claim or count-by-count. We call this the *gestalt* approach. Derived from German, *gestalt* means a "perceptual pattern or structure possessing qualities as a whole that cannot be described merely as a sum of its parts." *Gestalt*, *Collins English Dictionary* (2023). As requested, the trial judge used the gestalt approach, analyzing whether either side "ultimately

- 27 -

succeeded writ large." Since neither side challenges the correctness of that approach, we assume without deciding that it is what § 12.01 calls for.[14]

With that framing in mind, we address the applicable standard of review and then apply it to the trial court's ruling.

### 1. *The abuse-of-discretion standard applies to the trial court's prevailing-party determination.*

The parties disagree about the standard of review that applies when considering the trial court's conclusion that neither side was a prevailing party. Bavely asks us to review that determination "de novo" on the theory that it calls for a legal interpretation of § 12.01 of the operating agreement. AV calls the trial court's prevailing-party determination a "finding of fact" that we must uphold unless plainly wrong or without evidence to support it. Neither party cites controlling precedent directly on point.

Our Supreme Court came close to answering that question (but ultimately did not) in *Raintree of Albemarle Homeowners Association v. Jones*, 243 Va. 155 (1992). *Raintree* involved Code § 55-515, entitling the "prevailing party" to attorney fees in suits under the Property Owners' Association Act. The Court said that the defendants there had "prevailed on certain claims and the [plaintiff] prevailed on others." *Id.* at 161. The Court held "that the trial court did not err by refusing to award attorney[] fees to the Joneses." *Id.* Unfortunately, the Court did not say whether it considered the issue de novo, decided that the trial court did not

---

[14] Courts in other States have divided over whether a fee-shifting provision requires a claim-by-claim or gestalt approach to determining who prevailed. *Compare Bako Pathology LP v. Bakotic*, 288 A.3d 252, 281 (Del. 2022) (describing the traditional approach to determining prevailing-party status as "'an all-or-nothing approach involving an inquiry into which party predominated in the litigation[,]' as opposed to a claim-by-claim or other partial basis approach" (citation omitted)), *with Miller v. Rocking Ranch No. 3 Prop. Owners' Ass'n*, 541 P.3d 1279, 1293 (Idaho 2024) ("[T]he determination of whether the party is entitled to recover its fees under the contract is a claim-by-claim determination that examines whether the party seeking fees recovered on each claim covered by the contractual attorney fee provision.").

abuse its discretion, or determined that the trial court's ruling was adequately supported by the evidence.

We disagree with Bavely that de novo review of the trial court's prevailing-party determination is required by *Hollowell v. Virginia Marine Resources Commission*, 56 Va. App. 70 (2010). *Hollowell* was not a mixed-result case involving a bilateral fee-shifting provision like the one here where each side claimed some victory and suffered some losses. The only question there was whether Hollowell had substantially prevailed in his challenge to the agency's action, entitling him to attorney fees under Code § 2.2-4030(a). Because Hollowell succeeded in invalidating a portion of the VMRC's regulation as unlawful and in obtaining an order compelling the agency to amend the regulation, we said the trial court had "erred as a matter of law in ruling that Hollowell did not substantially prevail." *Id.* at 87. *Hollowell* does not address the standard of review when the prevailing-party determination requires the trial court to assess each side's relative wins and losses in a mixed-result case with multi-count claims and counterclaims. Without controlling authority on that question, we must take a fresh look.

"For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable de novo), questions of fact (reviewable for clear error), and matters of discretion (reviewable for 'abuse of discretion')." *Pierce v. Underwood*, 487 U.S. 552, 558 (1988) (emphasis removed). When a party prevails on some but not all claims in a mixed-result case, the trial court's prevailing-party determination could be thought to fit each or all of those categories. It could be a legal ruling interpreting and applying the text of the fee-shifting provision. It could be a factual determination based on the trial court's sorting of the successful and unsuccessful claims. Or it could require judgment in weighing the party's relative successes and failures, something that typically calls for abuse-of-discretion deference. So which is it?

- 29 -

No clear answer emerges from looking at other jurisdictions. Of the State courts to address the question, most (18) apply the abuse-of-discretion standard to a trial court's prevailing-party determination.[15] Thirteen apply de novo review.[16] A couple treat the trial court's prevailing-party determination as a factual finding reviewable only for clear error.[17] Although the United States Supreme Court has not yet weighed in, the federal circuits almost uniformly apply de novo review to that question.[18]

---

[15] *See State v. Anthoney*, 229 P.3d 164, 166 (Alaska 2010); *Crowe v. Gierst*, 567 P.3d 759, 761-62 (Ariz. Ct. App. 2025); *Harrill & Sutter P.L.L.C. v. Kosin*, 424 S.W.3d 272, 278-79 (Ark. 2012); *Artus v. Gramercy Towers Condo. Ass'n*, 292 Cal. Rptr. 3d 150, 155-56 (Cal. Ct. App. 2022); *Anderson v. Pursell*, 244 P.3d 1188, 1194 (Colo. 2010); *Gianetti v. Norwalk Hosp.*, 43 A.3d 567, 604 (Conn. 2012); *Bako*, 288 A.3d at 282 (Del.); *Kun Xiang v. Ocala Heart Clinic II LLC*, 379 So. 3d 561, 566 (Fla. Dist. Ct. App. 2024); *Sunnyside Park Utils., Inc. v. Sorrells*, 568 P.3d 820, 829 (Idaho 2025); *Brightwell v. City of Shreveport*, 356 So. 3d 586, 593 (La. Ct. App. 2023); *Benigni v. Cnty. of St. Louis*, 585 N.W.2d 51, 54-55 (Minn. 1998); *Kratzer v. Hardy Constr. Co.*, DA 24-0320, 2025 Mont. LEXIS 686, at *8 (July 1, 2025); *Stodgell v. Weissman*, 561 P.3d 1097, 1101 (N.M. Ct. App. 2024); *Rogers v. RGIS LLP*, 213 P.3d 583, 586 (Or. Ct. App. 2009); *Clean Harbors Env't Servs. v. 96-108 Pine St. LLC*, 286 A.3d 838, 843, 845 (R.I. 2023); *EFCO Corp. v. Renaissance on Charleston Harbor, LLC*, 635 S.E.2d 922, 924 (S.C. Ct. App. 2006); *R.T. Nielson Co. v. Cook*, 40 P.3d 1119, 1127 (Utah 2002); *Sweet v. St. Pierre*, 201 A.3d 978, 986 (Vt. 2018).

[16] *Holland v. United Servs. Auto. Ass'n*, 707 S.W.3d 541, 550 (Ky. Ct. App. 2025); *Sugarloaf All., Inc. v. Frederick Cnty.*, 334 A.3d 1150, 1163-64 (Md. App. Ct. 2025); *Ferman v. Sturgis Cleaners, Inc.*, 116 N.E.3d 1196 (Mass. 2019); *Pontiac Country Club v. Waterford Twp.*, 830 N.W.2d 785 (Mich. Ct. App. 2013); *Parkway Constr. Servs. v. Blackline LLC*, 573 S.W.3d 652, 666 (Mo. Ct. App. 2019); *Abbott v. City of Bellevue*, 967 N.W.2d 95, 107 (Neb. 2021); *Free Spirit Aviation, Inc. v. Rutherford Airport Auth.*, 696 S.E.2d 559 (N.C. Ct. App. 2010); *Whitetail Wave LLC v. XTO Energy, Inc.*, 5 N.W.3d 526, 531 (N.D. 2024); *Inv'r Support Servs., LLC v. Dawoud*, No. CA2020-09-060, 2021 Ohio App. LEXIS 2272, at *9 (2021); *In re Order on Rehearing & Motion for Atty.'s Fees*, No. 113973, 2017 Okla. LEXIS 10, at *4 (2017); *Durland v. San Juan Cnty.*, 340 P.3d 191, 202 (Wash. 2014); *State ex rel. Oitzinger v. City of Marinette*, 19 N.W.3d 663, 679 (Wisc. Ct. App. 2025); *Essex Holding, LLC v. Basic Props., Inc.*, 427 P.3d 708, 726 (Wyo. 2018).

[17] *See Classroomdirect.com, LLC v. Draphix, LLC*, 992 So. 2d 692, 712 (Ala. 2008); *Homeward Residential, Inc. v. Gregor*, 165 A.3d 357, 361 (Me. 2017).

[18] *See Aronov v. Napolitano*, 562 F.3d 84, 88 (1st Cir. 2009) (en banc); *Dimartile v. Hochul*, 80 F.4th 443, 450-51 (2d Cir. 2023); *Truesdell v. Phila. Hous. Auth.*, 290 F.3d 159, 163 (3d Cir. 2002); *Grabarczyk v. Stein*, 32 F.4th 301, 306 (4th Cir. 2022); *Keiland Constr., L.L.C. v.*

Still, Justice Scalia's opinion for the Court in *Pierce* provides a helpful framework to determine which standard to apply when, as here, "neither a clear statutory prescription nor a historical tradition exists." 487 U.S. at 558. The question in *Pierce* was which standard to apply when reviewing a district court's denial of attorney fees under the Equal Access to Justice Act on the ground that the government's position was "substantially justified." The Court answered that question by considering whether, "as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *Id.* at 559-60. *Pierce* concluded that the district court was best situated to decide if the government's position was substantially justified, thus calling for "deferential, abuse-of-discretion review." *Id.* at 560.

The Court offered several justifications. "By reason of settlement conferences and other pretrial activities, the district court may have insights not conveyed by the record, into such matters as whether particular evidence was worthy of being relied upon, or whether critical facts could easily have been verified by the Government." *Id.* And even if an appellate court could gain "the district judge's full knowledge of the factual setting," it would come "at unusual expense." *Id.* For the appellate court would face "the unaccustomed task of reviewing the entire record, not just to determine whether there existed the usual minimum support for the merits

---

*Wks. Marine, Inc.*, 109 F.4th 406, 421 (5th Cir. 2024); *Binta B. v. Gordon*, 710 F.3d 608, 617-18 (6th Cir. 2013); *Dupuy v. Samuels*, 423 F.3d 714, 718 (7th Cir. 2005); *Ryan Data Exch., Ltd. v. Graco, Inc.*, 913 F.3d 726, 735 (8th Cir. 2019); *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1033-34 n.11 (9th Cir.), *cert. denied*, 144 S. Ct. 190 (2023); *Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227, 1233 (10th Cir. 2018); *Beach Blitz Co. v. City of Miami Beach*, 13 F.4th 1289, 1297 (11th Cir. 2021); *Cactus Canyon Quarries, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 820 F.3d 12, 15 (D.C. Cir. 2016); *Luv N' Care, Ltd. v. Laurain*, 98 F.4th 1081, 1105 (Fed. Cir. 2024). *But see Tax Track Sys. Corp. v. New Inv'r World, Inc.*, 478 F.3d 783, 788-89 (7th Cir. 2007) ("[W]hether NIW substantially prevailed within the meaning of the contract is a mixed question of fact and law, or stated differently, an application of the legal standard ('substantially prevailing') to the facts."); *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 38 F.4th 1372, 1375 (11th Cir. 2022) ("In reviewing a district court's prevailing party determination, we review the court's underlying factual findings for clear error but review de novo the legal question of whether those facts suffice to render a party a 'prevailing party.'").

determination made by the factfinder below, but to determine whether urging of the opposite merits determination was substantially justified." *Id.*

*Pierce* also noted the difficulty of formulating a judicially administrable rule to decide when the government's position is "substantially justified." A "good" reason to confer "discretion on the trial judge is the sheer impracticability of formulating a rule of decision . . . . Many questions . . . are not amenable to regulation by rule because they involve multifarious, fleeting, special, narrow facts that utterly resist generalization—at least, for the time being." *Id.* at 561-62 (quoting Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above*, 22 Syracuse L. Rev. 635, 662 (1971)). "[T]he question whether the Government's litigating position has been 'substantially justified,'" the Court concluded, "is precisely such a multifarious and novel question, little susceptible, for the time being at least, of useful generalization, and likely to profit from the experience that an abuse-of-discretion rule will permit to develop." *Id.* at 562. The Court also said that an abuse-of-discretion standard would "implement our view that a 'request for attorney[] fees should not result in a second major litigation.'" *Id.* at 563 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).

The Supreme Court has applied its approach in *Pierce* to other cases when determining the applicable standard of review for attorney-fee rulings. Thus, the Court held that "all aspects" of a district court's determination to award attorney fees under the Patent Act—on the statutory ground that the case is "exceptional"—should be reviewed for abuse of discretion. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563-64 (2014). The Court added that an abuse-of-discretion standard would "not preclude an appellate court's correction of a district court's legal or factual error." *Id.* at 563 n.2. The district court "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405

(1990)).  *See also McLane Co. v. EEOC*, 581 U.S. 72, 79 (2017) (following *Pierce* to hold that a district court's decision whether to enforce or quash an EEOC subpoena should be reviewed for abuse of discretion, not de novo).

We find that similar considerations require that we apply the abuse-of-discretion standard to a trial court's prevailing-party determination in a mixed-result case when, as here, the parties have agreed to a gestalt approach to identifying who prevailed.[19]  As in *Pierce*, the trial judge's experience living through the litigation in real time gives the trial court a broad and deep understanding of the case that an appellate court could match, if ever, only by an "unusual expense" of time and resources.  487 U.S. at 560.  This litigation is a good example, where the record alone exceeds 53,000 pages.

And just as there is no clear administrable standard to award attorney fees when a patent case is "exceptional," *Highmark*, 572 U.S. at 563-64, or the government's position not "substantially justified," *Pierce*, 487 U.S. at 562-63, neither is there an obvious legal standard for measuring when a litigant is the prevailing party in a mixed-result case with multiple fee-bearing claims and counterclaims.  "The determination of who is a 'prevailing party' often requires nuanced evaluation of the proof, pleadings, pretrial and trial rulings and verdict dispositions in an action . . . ."  *Graham v. Cmty. Mgmt. Corp.*, 294 Va. 222, 231 n.8 (2017).  State courts adopting the abuse-of-discretion standard have reasoned that "the trial court is in a better position than we are as an appellate court to decide which party" has prevailed.  *R.T. Nielson Co. v. Cook*, 40 P.3d 1119, 1127 (Utah 2002).

---

[19] We thus do not reach whether the abuse-of-discretion standard would apply when the fee-shifting provision requires a claim-by-claim approach or when the case involves only a single claim.  *See Rebh v. Cnty. Bd. of Arlington Cnty.*, 303 Va. 379, 382 (2024) ("Our doctrine of judicial restraint requires appellate courts to decide cases 'on the best and narrowest ground available.'" (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010))).

Utah's highest court in *R.T. Nielson* explained why an abuse-of-discretion standard fits

best with the discretionary factors that a trial judge could appropriately consider:

> Appropriate considerations . . . would include, but are not limited
> to, (1) contractual language, (2) the number of claims,
> counterclaims, cross-claims, etc., brought by the parties, (3) the
> importance of the claims relative to each other and their
> significance in the context of the lawsuit considered as a whole,
> and (4) the dollar amounts attached to and awarded in connection
> with the various claims. . . .

*Id.* Although the Utah court expected "most cases" to have "only one prevailing party," the court

said its standard would "permit a case-by-case evaluation by the trial court, and flexibility to

handle circumstances where both, or neither, parties may be considered to have prevailed." *Id.*;

*accord Skylink Jets, Inc. v. Klukan*, 308 So. 3d 1048, 1049, 1051 (Fla. Dist. Ct. App. 2020)

(applying abuse-of-discretion standard to prevailing-party determination because "the fairest test

to determine who is the prevailing party is to allow the trial judge to determine from the record

which party has in fact prevailed on the significant issues tried before the court" (citation

omitted)); *Clean Harbors Env't Servs. v. 96-108 Pine St. LLC*, 286 A.3d 838, 843, 845 (R.I.

2023) (same, explaining that "a trial justice is in the best position to assess the merit of each

party's claims or defenses, and to determine which party fairly may be said to have prevailed on

the significant issues" (citation omitted)).

The abuse-of-discretion standard we adopt for reviewing prevailing-party determinations

under the gestalt approach comports with how Virginia has handled fee-shifting issues in similar

contexts. Consider three examples.

First, like the United States Supreme Court in interpreting Rule 11 of the Federal Rules of

Civil Procedure, our Supreme Court has applied the abuse-of-discretion standard to all aspects of

a sanctions award under Code § 8.01-271.1, including when a sanctions ruling requires applying

law to facts. *See Oxenham v. Johnson*, 241 Va. 281, 286-87 (1991); *accord Cooter & Gell*, 496

U.S. at 399-405. Before *Cooter & Gell*, several federal circuits had applied de novo review when reviewing trial court rulings that a legal filing was without basis in law. *See* 1 Steven A. Childress & Martha S. Davis, *Federal Standards of Review* § 4.15[2], at 4-132 & n.54 (5th ed. 2024) (collecting cases). But following the *Pierce* rationale, *Cooter & Gell* abrogated those rulings, rejecting a "three-tiered standard of review" in favor of "an abuse-of-discretion standard in reviewing 'all aspects' of a district court's Rule 11 determination." 496 U.S. at 405. Finding the federal and Virginia sanctions standards to be "similar," our Supreme Court followed suit in *Oxenham*. 241 Va. at 286-87 & n.4. The Court also agreed with the U.S. Supreme Court that an abuse-of-discretion standard would not insulate a trial-court ruling from review for legal error or factual mistakes. For the trial court "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a *clearly* erroneous assessment of the evidence." *Id.* at 287 (quoting *Cooter & Gell*, 496 U.S. at 405).

Second, the General Assembly has adopted § 5-111 of the Uniform Commercial Code, which provides in letter-of-credit disputes governed by that title for the "prevailing party" to recover its reasonable attorney fees. Code § 8.5A-111(e). The guidance provided for mixed-result cases, reprinted in our Code, fits the problem confronted here: "Sometimes it will be unclear which party 'prevailed,' for example, where there are multiple issues and one party wins on some and the other party wins on others. Determining which is the prevailing party is in the discretion of the court." *Id.* official cmt. 6. That guidance shows by analogy that an abuse-of-discretion standard is the right one to apply here. *Accord Süd Fam. Ltd. P'ship v. Otto Baum Co.*, 237 N.E.3d 1075, 1104 (Ill. App. Ct. 2024) (citing U.C.C. § 5-111(e) as adopted in Illinois and official comment 6 in support of the abuse-of-discretion standard).

Third, an abuse-of-discretion standard finds at least some support by analogy to appeals of attorney-fee rulings under the Virginia Freedom of Information Act. A petitioner who

"substantially prevails on the merits of the case" is entitled to reasonable attorney fees "unless special circumstances would make an award unjust." Code § 2.2-3713(D). The Supreme Court has affirmed trial-court rulings that a petitioner had not substantially prevailed when she won some claims but failed to win the "gravamen" of the suit. *See Hill v. Fairfax Cnty. Sch. Bd.*, 284 Va. 306, 314-15 (2012). It is true that *Hill*, like *Raintree* before it, did not make clear which standard of review the Court applied in evaluating the appellant's prevailing-party status there. But *Hill* laid out the trial court's reasoning in a way that at least suggests abuse-of-discretion review. The trial court found that Hill's tepid success in establishing a small number of FOIA violations paled in comparison to losing the main thrust of her lawsuit, which sought to set aside the board's school-closing decision based on alleged open-meeting violations. *Id.*

As the U.S. Supreme Court noted in *Highmark* and our Supreme Court said in *Oxenham*, an abuse-of-discretion standard will not immunize the trial court's prevailing-party decision from review for legal error, absence of factual support, or clear abuse of judgment. For it is by now a familiar appellate mantra that "[a] trial court abuses its discretion by (1) failing to consider a significant relevant factor, (2) giving significant weight to an irrelevant or improper factor, (3) committing a clear error of judgment in assigning weight to all proper factors, or (4) making a mistake of law." *Citizens for Fauquier Cnty. v. Town of Warrenton*, 81 Va. App. 363, 385 (2024) (quoting *Cornelius v. Commonwealth*, 80 Va. App. 29, 41 n.13 (2024)). Thus, for instance, a trial court could abuse its discretion by committing a mistake of law in awarding fees on a non-fee-bearing claim. *E.g.*, *Commonwealth v. Lotz Realty Co.*, 237 Va. 1, 11 (1989) ("[A] party is not entitled to attorney's fees under [42 U.S.C.] § 1988 if he succeeds only on 'a nonfee claim' even though he presents another claim that may have been cognizable under § 1983.").

In short, we hold that the abuse-of-discretion standard governs appellate review of the trial court's prevailing-party determination in a mixed-result case where the gestalt approach determines which side prevailed.

2. *The trial court did not abuse its discretion in finding that Bavely was not a prevailing party for the fee-bearing claims.*

Applying the abuse-of-discretion standard, we agree with AV that "[i]n light of the parties' comparative wins and losses, the trial court did not err in denying their competing motions for attorney fees." AV Br. 23. We find no abuse of discretion by the trial court in concluding that "neither party in this matter is the prevailing party, because both sides lost more than they desired to gain." Each side originally sought tens of millions of dollars in damages and came up almost entirely short. At oral argument here, Bavely estimated the total value of his demands at $60-70 million. More importantly, he also sought to be restored to his position in AV, something that AV viewed as an "existential threat." AV Br. 1.

Bavely achieved only fleeting success compared to his goals. True, he won a sizable, $17.7 million judgment on counterclaim count 4 after AV invited the jury to award buyout damages. But Bavely's forced buyout is precisely what AV had wanted since 2018. And the amount Bavely recovered was a little more than half of the ad damnum in his counterclaim.

Comparing the actual results to the gravamen of the original claims and counterclaims to enforce the operating agreement, we see no abuse of discretion in the trial court's conclusion that neither side was the prevailing party. And since each side defeated the other side's appeal here, while failing to win its own, we likewise deny the parties' respective requests for appellate fees.

D. *Bavely may seek to increase the suspending bond.*

An important procedural matter remains. Upon further consideration, we vacate in part this Court's February 24, 2025 order that vacated the trial court's order requiring AV to post additional security of $87,041. Having reconsidered AV's fully briefed motion, we reject AV's

argument that Code § 8.01-676.1 caps the post-judgment-interest portion of a suspending bond at one year's interest. As explained below, our ruling here leaves Bavely free, if he chooses, to seek an increase in the amount of the security required to suspend execution on the judgment pending appeal.

    *1. The Court previously vacated the trial court's order requiring more security.*

The trial court entered judgment against AV on November 15, 2023 in "the principal sum of . . . $17,654,445[], with post-judgment interest accruing at the statutory rate of 6% from November 2, 2022 [the date of the jury verdict] until the judgment amount is paid in full." The simple interest accruing on the judgment comes to $2,902 per day, $88,272 per month, and $1,059,267 per year.

On December 7, 2023, before filing its notice of appeal, AV posted as security an irrevocable letter of credit of $19,929,692, securing payment by the AV parties in case their appeal is unsuccessful. That sum included, in addition to the judgment amount, interest of $2,275,247. That amount represents post-judgment interest at 6% for 784 days from the jury verdict. The letter of credit thus secured the judgment plus interest through December 25, 2024—one year after AV filed its December 24, 2023 notice of appeal. AV included that additional one year's interest in compliance with Code § 8.01-676.1(J), which provides that "the amount of the suspending bond or irrevocable letter of credit shall include an amount equivalent to one year's interest calculated from the date of the notice of appeal."

The parties' consolidated appeal soon ran into administrative delays through no fault of their own. The original record forwarded electronically by the circuit-court clerk was enormous—33,708 pages. But it was only about two-thirds complete. Over the next six months, the parties filed multiple joint motions for writs of certiorari under Code § 8.01-675.4 to compel the circuit-court clerk to forward the missing portions. After we repeatedly accommodated that

delay by extending the briefing deadlines, the parties were finally able to file their opening briefs on November 7, 2024—eight months later than they were originally due.[20]

By the end of December 2024, however, the interest accruing on the judgment began to exceed the amount secured by AV's letter of credit. So in January 2025, Bavely moved the trial court to increase the security to cover an additional one year's post-judgment interest ($1,059,267). Rule 1:1B(a)(3) authorized that motion, providing that "the circuit court retains limited, concurrent jurisdiction during the pendency of the appeal solely for the purposes of," among other things, "addressing motions and objections in civil cases relating to the *amount . . . of an appeal or suspending bond pursuant to Code § 8.01-676.1*." (Emphasis added.) AV opposed Bavely's motion, arguing that Code § 8.01-676.1(J) caps the post-judgment interest amount at "one year's interest" and that only the appellate courts are empowered to require more.

The trial court granted Bavely's motion in part. The court declined to require an additional year's interest. But in an order dated January 29, 2025, the trial court directed AV to post additional security of $87,041, the additional interest that had accrued from the end of the secured period to the date of that order.[21]

AV promptly moved in Record No. 2168-23-4 for review of the trial court's January 2025 order, and the matter was assigned to a three-judge motions panel. AV repeated its argument that Code § 8.01-676.1(J) required security for only one year's post-judgment interest

---

[20] Even after the briefing was finished, the record turned out to be incomplete. The parties jointly moved for certiorari again on March 6, 2025, resulting in two more supplemental record filings here by the circuit court clerk's office.

[21] When a court orders an increase in the amount of security, the appellant has 15 days to post it, or else "the suspension of execution of a judgment shall be discontinued." Code § 8.01-676.1(E)(4). The trial court suspended that 15-day period to let AV seek review of its ruling here.

and that only the appellate courts, not the trial court, could require more.  Bavely opposed AV's

motion but did not request additional security beyond the $87,041 ordered by the trial court.

On February 24, 2025, the motions panel entered an unpublished order that granted AV's

motion and vacated the trial court's January 29 order.  The panel concluded as a matter of law

that Code § 8.01-676.1 "expressly limits the amount of the irrevocable letter of credit to an

amount equal to the judgment and damages plus one year's interest calculated from the date of

the notice of appeal."

### 2. *Code § 8.01-676.1(J) does not prevent a court from requiring security for more than one-year's post-judgment interest.*

Upon careful reflection, we find that ruling to be in error.  The correct interpretation of

Code § 8.01-676.1 presents a question of law that we review de novo.  *E.g.*, *Welsh v.*

*Commonwealth*, ___ Va. ___, ___ (Mar. 20, 2025).

To suspend execution of a judgment pending appeal, the appellant must post a

suspending bond or irrevocable letter of credit in the trial court.[22]  *See* Code § 8.01-676.1(C), (J).

The "suspending bond" is in addition to the "appeal bond" an appellant must post to secure

payment of court costs if the appeal proves unsuccessful.  *Compare* Code § 8.01-676.1(A) & (B),

*with* 8.01-676.1(C) & (J).  Filing a suspending bond or letter of credit is *not* required to appeal an

adverse judgment; but if an appellant declines or fails to post the required security, the judgment

---

[22] Before the 2015 amendment to Code § 8.01-676.1, a suspending bond was typically called a "supersedeas" or "supersedeas bond."  *See, e.g.*, *Henderson v. Ayres & Hartnett, P.C.*, 285 Va. 556, 561 (2013).  The Latin term means "you shall desist" and, in law, refers to a "writ or bond that suspends a judgment creditor's power to levy execution, usu[ally] pending appeal." *Supersedeas*, *Black's Law Dictionary* (12th ed. 2024); *see also Supersedeas Bond*, *Black's Law Dictionary*, *supra* (defining *supersedeas bond* as "[a]n appellant's bond to stay execution on a judgment during the pendency of the appeal").  The Boyd-Graves Conference in 2015 recommended abandoning the "anachronistic" Latin term in favor of "suspending bond."  Report of the Committee on Appeal and Suspending Bonds 4 (Aug. 21, 2015), https://perma.cc/3NMM-X32R ("Boyd-Graves Study"); *see also* 1 Virginia Civil Procedure § 17.6 (2024) ("A major set of proposals debated and approved by the Boyd Graves Conference have resulted in legislation updating antiquated provisions relating to bonds in connection with appeal.").

creditor may execute on the assets of the appellant (the judgment debtor) in spite of the appeal. *See* Code § 8.01-676.1(C), (E)(4).[23]

As our Supreme Court put it more than a hundred years ago, the purpose of posting security "is to secure to a successful litigant the ultimate fruits of his recovery, in whole or in part, and to insure him against loss from the possible insolvency of his debtor, or from other cause, pending the appeal." *Nat'l Sur. Co. v. Commonwealth*, 125 Va. 223, 228 (1919). More recently, the Court has explained "that '[t]he purpose of the statute is to secure payment of the full judgment amount and all damages incurred as a result of the suspension.' 'A lesser amount would undermine the security of the judgment . . . .'" *Henderson v. Ayres & Hartnett, P.C.*, 285 Va. 556, 562 (2013) (alteration in original) (quoting *Tauber v. Commonwealth*, 263 Va. 520, 545 (2002)). The Court in *Henderson* held that "[t]he circuit court erred in not setting a bond adequate to satisfy all damages resulting from suspending execution of the judgment as required." *Id.*

The details, however, are controlled by the statute. Code § 8.01-676.1(C) provides that a suspending bond or irrevocable letter of credit must be "conditioned upon the performance or satisfaction o*f the judgment and payment of all damages* incurred in consequence of such suspension." (Emphasis added.) The term "damages" refers to the post-judgment interest running on the judgment as specified in Code § 8.01-682.[24] The applicable rate of post-judgment

---

[23] The failure to file a proper appeal bond, by contrast, may result in the dismissal of the appeal. *See generally* Code § 8.01-676.1(A), (P); Rule 5:24(b); Rule 5A:17(b). But "[n]o person who is an indigent shall be required to post security for an appeal bond." Code § 8.01-676.1(N). And neither an appeal bond nor a suspending bond is required of a defendant in a criminal appeal. *See* Code § 8.01-676.1(A1).

[24] Code § 8.01-682 ("What damages awarded appellee"), provides:

> When any judgment is affirmed, whether in whole or in part,
> damages shall be awarded to the appellee on the portion of the

interest is the higher of 6% per annum or, for "a money judgment entered in an action arising from a contract[,] . . . the rate lawfully charged on such contract." Code § 6.2-302(A).

Code § 8.01-676.1(J) then tells the appellant how to calculate the amount of the required security. As noted above, "the amount of the suspending bond or irrevocable letter of credit shall include an amount equivalent to one year's interest calculated from the date of the notice of appeal in accordance with [the interest rates in] § 8.01-682." Code § 8.01-676.1(J).

We reject AV's argument that subsection J requires the trial court to cap the security for post-judgment interest at one year, even when an appeal takes much longer. The amount of security to cover the judgment and damages pending appeal is intended to cover "the entire course of appellate review by any courts." Code § 8.01-676.1(J). So the post-judgment interest component necessarily includes a prediction of how long the appeal will take in the Court of Appeals and the Supreme Court. That prediction is not immune from readjustment based on the facts and circumstances.

The statute imposes minimum and maximum amounts of security if the parties do not waive the requirement or do not agree to a lesser amount.[25] Code § 8.01-676.1(J) provides, at the high end, that the amount of security "shall not exceed $25 million, regardless of the value of the judgment." For smaller judgments, a court "[f]or good cause shown . . . may . . . waive the

_____

judgment affirmed. When the judgment is for the payment of money, the damages shall be the interest to which the party is legally entitled, as provided in § 6.2-302 or any other provision of law, from the date of filing the notice of appeal until the date the appellate court issues its mandate. Such interest shall be computed upon the whole amount of the recovery affirmed, including interest and costs, and such damages shall be in satisfaction of all interest during such period of time.

[25] *See* Code § 8.01-676.1(L) (allowing the parties "to waive the requirement of a suspending bond or irrevocable letter of credit or agree to a suspending bond or irrevocable letter of credit in an amount less than the compensatory damages").

filing of a suspending bond or irrevocable letter of credit as to the damages in excess of, or other than, the compensatory damages." Code § 8.01-676.1(L). In other words, even for good cause shown, a court may not order that the security be in an amount *less* than the compensatory damages if the appellee does not consent.[26] *Id.*

The one-year's interest provision in Code § 8.01-676.1(J) is simply an off-the-rack formula that allows the parties at the outset to calculate the portion of the security needed to cover the post-judgment interest pending appeal. Before the 2016 amendment, the statute provided no such guidance.[27]

Still, the "one year's interest" provision does not operate as a cap. As noted above, Rule 1:1B(a)(3)(C) provides "concurrent jurisdiction" for the trial court or appellate court to entertain "motions . . . relating to the amount . . . of an appeal or suspending bond pursuant to Code § 8.01-676.1." Subsection C of that code provision says that once the appellant posts an adequate suspending bond or letter of credit, "additional security shall not be necessary *except as to any additional amount that may be added or to any additional requirement that may be imposed by the courts*." Code § 8.01-676.1(C) (emphasis added). Subsection (E)(1) further

---

[26] We acknowledge some tension between the text of Code § 8.01-676.1(L) and some of the language in *Henderson*. *Henderson* said that the trial court could not require security in an amount less than what is "adequate to satisfy *all damages* resulting from suspending execution." 285 Va. at 542 (emphasis added). Since *damages* under Code § 8.01-682 means *post-judgment interest*, *Henderson* suggests that a trial court may not waive security for any post-judgment interest. But the text of Code § 8.01-676.1(L) permits the trial court for good cause shown to waive the security required "in excess of, or other than, the *compensatory* damages." (Emphasis added.) Subsection L was added in 2000, *see* 2000 Va. Acts ch. 100 at 145, but it was not mentioned by the Supreme Court in either *Tauber* (in 2002) or *Henderson* (in 2013). We need not resolve that tension here, however, because AV has not moved for good cause shown to waive the security in excess of the compensatory-damage award.

[27] The Boyd-Graves study committee "estimated that most practitioners include[d] *some* amount of post-judgment interest," but the committee observed that "practitioners frequently use[d] varying time periods (*e.g.*, 6 months, 9 months, one year), and d[id] not include the proper amount of interest to protect the judgment creditor's rights under Code § 8.01-682." Boyd-Graves Study, *supra*, at 3.

provides that the trial court "may . . . for good cause shown, modify the terms of the security . . . until the Court of Appeals or the Supreme Court acts upon any similar motion."  Code § 8.01-676.1(E)(1).  Taken together, these provisions make clear that the trial court enjoys concurrent jurisdiction to increase the security for good cause shown to cover additional post-judgment interest.

Bavely properly sought that increase first in the trial court.  The court that tried the case and rendered the judgment will usually be in the best position to take evidence, hold a hearing, and timely rule on a motion to increase such security.  A trial court's ruling on that question is then subject to review "by the appellate court before which the case is pending." *Id.*  AV correctly followed that path here.

The statute also authorizes the appellate court to increase or decrease the amount of security when the appeal is pending before it.  Code § 8.01-676.1(E)(2) provides:

> The Court of Appeals or the Supreme Court may order that the penalty or any other terms or requirements of the security . . . for the suspension of execution of a judgment be modified for good cause shown (i) upon the motion of any party or (ii) if such request is made in the brief of any party filed in the Court of Appeals, or in the Petition for Appeal or the appellee's Brief in Opposition filed in the Supreme Court or the Court of Appeals.

In whichever court the motion is filed, the parties may support their positions with "[a]ffidavits and counter-affidavits . . . containing facts pertinent to such request."  Code § 8.01-676.1(E)(3).

In short, because Code § 8.01-676.1 makes clear that the trial and appellate courts enjoy concurrent authority to change the amount of security required, subsection (J) does not cap the security for post-judgment interest at one year's amount.  The one-year's-interest provision operates as a convenient initial estimate about how long the appeal will take to run its course.  It does not prevent the appellee from seeking more security when that estimate proves incorrect.

- 44 -

We thus vacate this Court's February 24, 2025 order to the extent it ruled that Code § 8.01-676.1(J) prohibits a court from requiring security for more than one year's post-judgment interest. But we decline to reinstate the trial court's January 29, 2025 order requiring AV to post additional security of $87,041. That amount represented less than one month's additional interest beyond the period secured by AV's letter of credit. Although Bavely asked the trial court to require another year of post-judgment interest, we do not fault the trial court for proceeding cautiously. Without authoritative guidance, the court required only the modest amount of additional interest that had by then accrued. Our ruling here is without prejudice to Bavely's right to move for additional security under Code § 8.01-676.1, should he be so inclined.

CONCLUSION

In sum, the judgment is affirmed in both appeals and the parties' requests for appellate fees are denied. The Court vacates in part its February 24, 2025 order in Record No. 2168-23-4, leaving Bavely free, if he be so advised, to move under Code § 8.01-676.1 for an increase in the security required to suspend execution of the judgment pending appeal.

*Affirmed.*